UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| DARYL W. DAVIS | NO. 06-60-D-M2 |

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

Signed in chambers in Baton Rouge, Louisiana, March 3, 2011.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                                        **CRIMINAL ACTION**

**VERSUS**

**DARYL W. DAVIS**                                                             **NO. 06-60-D-M2**

## MAGISTRATE'S REPORT AND RECOMMENDATION

This matter is before the Court on the Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (R. Doc. 97) filed by petitioner, Daryl W. Davis ("Davis" or "petitioner"). The United States of America ("United States") has filed an opposition (R. Doc. 103) to such motion, in response to which Davis has filed a reply memorandum. (R. Doc. 104).

## FACTS & PROCEDURAL BACKGROUND

The following factual findings were made by the Court after an evidentiary hearing was held on Davis' motion to suppress, which was held on July 26, 2006 and August 3, 2006 and followed by oral argument on November 30, 2006. Agent Chad Scott of the Drug Enforcement Administration ("DEA") out of New Orleans investigated Davis as a suspected drug-trafficker for approximately one (1) year prior to his arrest. Such investigation was conducted in conjunction with an investigation performed by Agent Mark Lusco of Baton Rouge. Both Agent Scott and Agent Lusco testified at the evidentiary hearing on Davis' motion to suppress.

During their investigation, Agents Scott and Lusco utilized confidential informants who provided information that Davis was a source of drug supply for several individuals. On March 25, 2005, a sting operation was made in Greensburg, Louisiana, in an effort to

1

arrest an individual that later became the United States' primary confidential informant. That informant, who will be referred to as "CI-3," was arrested for purchasing cocaine, and he later agreed to cooperate with law enforcement.

Several days later, on March 31, 2005, a traffic stop in Beaumont, Texas, resulted in the seizure of $380,000.00 from a hidden compartment of a van. The individual arrested during that stop will be referred to as "CI-1." CI-1 also agreed to cooperate with law enforcement, and he identified the seized money as belonging to Davis. CI-1 further informed law enforcement that he was following Davis from Baton Rouge to Houston to pick up a large quantity of cocaine and advised Agent Scott that he was put in contact with Davis through CI-3. He also advised Agent Scott that Davis agreed to pay him $400.00 for each kilogram of cocaine that he transported from Houston to Baton Rouge. CI-1 additionally informed Agent Scott that he manufactured two (2) hidden compartments in vehicles for Davis, for which Davis had paid him $5,000.00 per compartment.

In April 2005, Agent Scott arranged a sting operation to arrest another individual suspected of being involved in a cocaine deal. That individual will be referred to as "CI-2." When he was arrested, CI-2 informed Agent Scott that he received his cocaine from Davis and that he had done so on multiple occasions. CI-2 also told Agent Scott that Davis was the source of supply for CI-3 and that he acted as a courier for cocaine shipments between Davis and CI-3. Agent Scott contacted CI-3 and obtained his cooperation in providing to law enforcement information that could be used against Davis.

CI-3 stated that Davis was receiving approximately twenty (20) kilograms of cocaine at a time from an unknown source near Houston. CI-3 further advised that Davis fronted about five (5) to six (6) kilograms of cocaine to him on a biweekly basis. CI-3 assisted

2

Agent Scott by placing undercover calls to Davis and by attempting to arrange a cocaine purchase. Over a ten (10) month time period, several attempts were made to set up a cocaine transaction between CI-3 and Davis; however, those attempts failed. Nevertheless, during the course of those attempts, certain telephone calls between CI-3 and Davis were recorded, and Agent Scott testified that those calls corroborated the information provided by CI-3 regarding his involvement with Davis and Davis' involvement in drug trafficking in the Baton Rouge area. The calls also revealed that Davis did not have the cocaine for CI-3 during most of the attempted trades because Davis exhausted his drug supply before he could reestablish contact with CI-3. The investigation further revealed that Davis was having a difficult time obtaining cocaine from his supply source due to several losses, like the $380,000.00 and the three-and-a-half kilograms of cocaine seized in Beaumont, that he suffered.

On March 15, 2006, Agent Scott listened to calls between CI-3 and Davis in which Davis assured CI-3 that he would be able to provide cocaine to CI-3 and that CI-3 should remain in contact with Davis so that he could advise him when the next shipment was available as soon as it arrived. By the late afternoon of March 17, 2006, Davis had yet to contact CI-3, and Agent Scott therefore decided to terminate the day's investigation. However, later that evening, a confidential source working with Agent Lusco advised that Davis was expecting a shipment of cocaine that night. Agent Lusco relayed that message to Agent Scott. Approximately thirty (30) minutes later, CI-3 contacted Agent Scott to inform him that Davis had contacted him and that the two had made arrangements to meet at the Piccadilly's Restaurant in Denham Springs. Agent Scott contacted Agent Lusco, and

3

the two scrambled to gather officers to set up surveillance. In total, approximately ten (10) to twelve (12) officers set up a surveillance to observe CI-3's interaction with Davis.

CI-3, Davis, and an unidentified individual met at the parking lot of the Piccadilly's Restaurant. Their meeting, however, did not result in a drug trade. After Davis left the scene, Agent Scott and CI-3 discussed what had transpired. CI-3 advised Agent Scott that he and Davis discussed the purchase of six (6) kilograms of cocaine and that Davis wanted to see the money prior to the sale. When CI-3 informed Davis that he did not have the money, the two agreed to complete a drug transaction the next day. CI-3 further told Agent Scott that, although he did not actually see any cocaine in Davis' possession, he "felt" like Davis had the cocaine on him, and he believed that the drugs may have been hidden in a secret compartment in the truck.

Agent Scott then contacted Agent Lusco to relay the information provided to him by CI-3. Agents Scott and Lusco initially could not decide whether to stop Davis or to allow their investigation to continue; they decided to follow Davis' vehicle. While following him, Davis came upon police cars at an accident site, which cars had their emergency lights activated. He abruptly made a u-turn in order to avoid the police cars. It was at that moment that Agents Lusco and Scott made the decision to stop Davis. They stopped his vehicle at a traffic light and approached his vehicle with their guns drawn, ordering him to get out of his truck. Agent Scott immediately advised Davis of his *Miranda* rights. Davis stated that he understood his rights, agreed to speak with the officers, and consented to a search of his truck. Davis was then approached by Agent Lusco and Agent Norton, and he agreed to speak with the two (2) agents. Agent Lusco informed Davis that he wanted to place him in the backseat of a police unit to hide him from the public. Agent Lusco

4

testified that he wanted to protect Davis from being seen in the event Davis cooperated with the investigation. While Davis was in the patrol car, the doors were open, and the police holstered their guns. Agent Lusco testified that, while Davis was being detained, he was free to get out of the police car and stand on the side of road. He was not placed in handcuffs at that point.

While the officers were searching Davis' car, Agents Lusco and Norton questioned Davis. Before the search of his vehicle was completed, which resulted in no cocaine being found, Davis confessed that he had six (6) kilograms of cocaine at his residence, and he consented to a search of his house. The officers then placed Davis in handcuffs and drove to the house in his truck. After receiving consent to search the house from both Davis and his girlfriend, the officers located and seized the six (6) kilograms of cocaine (as well as a money counter, packaging materials, and a handgun) and arrested Davis. While at the residence, Davis attempted to set up a sale of the cocaine in an effort at cooperating with the DEA agents. He also cooperated by identifying the numbers of his sources in Houston, Texas, and by providing details of his drug trafficking activities.

On March 20, 2006, Davis was charged by complaint with knowingly and intentionally possessing, with the intent to distribute, five (5) kilograms or more of cocaine in violation of 21 U.S.C. §841(a)(1) and with possession of a firearm by a convicted felon in violation of 18 U.S.C. §922(g)(1). On March 22, 2006, a grand jury indicted him on the one (1) count of possession with intent to distribute five (5) or more kilograms of cocaine.

On May 18, 2006, Davis filed a motion to suppress the cocaine evidence seized from his residence. Following a two (2) day evidentiary hearing, oral argument, and post-hearing briefs, the District Judge denied Davis' motion. On December 18, 2006, Davis pled guilty

to the charge against him pursuant to a written plea agreement with the United States. Pursuant to that agreement, Davis waived his right to appeal his conviction and sentence, but reserved his right to appeal: (1) any punishment imposed in excess of the statutory maximum; (2) any punishment which is an upward departure pursuant to the guidelines; and (3) any punishment which is above the guidelines range calculated by the Court. Additionally, nothing in his plea agreement barred him from perfecting any legal remedies he may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel.

On July 6, 2007, the presentence report (PSR) became available for disclosure. In that report, the probation officer calculated the total amount of drugs attributable to Davis as being approximately 52.6 kilograms of cocaine HCL. Such calculation was based upon information ascertained from several confidential informants as well as statements that Davis made after being taken into custody and based upon the cocaine actually hidden at Davis' residence at the time of his arrest. Davis' counsel submitted objections to the PSR that specifically objected to Paragraphs 8 and 9 of the PSR, which related "to the quantity of cocaine being attributed to [Davis] for sentencing purposes."

Davis' sentencing was initially set for January 17, 2008; however, it was continued twice pursuant to motions filed by Davis. Additionally, prior to his sentencing, Davis' counsel, John McLindon, withdrew, and a federal public defender, Rebecca Hudsmith, then assumed the defense of Davis' case.

On August 12, 2008, Davis filed a motion to withdraw his guilty plea. In that motion, Davis argued that it was fair and just to allow him to withdraw his guilty plea prior to sentencing because neither he nor his attorney had information in the form of DEA reports

on CI-2 that provided information with respect to CI-3 critical to the prosecution of Davis' motion to suppress (and the key issue of the reliability of the informants in support of the reasonable cause to stop Davis) and as to the decision whether or not to plead guilty pursuant to a plea agreement whereby he waived his right to appeal an adverse ruling on the motion to suppress. In his motion to withdraw his guilty plea, Davis did not contend that he was "innocent of the offense of conviction" nor did he contend that he did not have the "close assistance of counsel in making the decision to ple[a]d guilty and to accept the Government's offer of a plea pursuant to a plea agreement whereby he would waive his right appeal the Court's adverse ruling on the motion to suppress." *See*, R. Doc. 72-1, p. 5. Instead, Davis sought to withdraw his guilty plea "for the purpose of re-opening the motion to suppress for re-consideration in light of [ ] new information (the DEA reports of CI-2, referencing CI-3) and for the purpose of entering a conditional guilty plea whereby he reserves his right to appeal an adverse ruling on the motion to suppress." *Id.*, p. 6.

A hearing on Davis' motion to withdraw guilty plea and sentencing was set for September 16, 2008. Prior to that hearing, on August 8, 2008, defense counsel filed a "Sentencing Memorandum" on behalf of Davis, in which his previous objections to the PSR were reurged and which requested that the Court sentence Davis to the lowest possible sentence (*i.e.*, "a sentence at or near the statutory mandatory minimum sentence of 120 months"). At the hearing on September 16, 2008, defense counsel (and Davis, himself, through live testimony) reiterated the arguments set forth in Davis' motion to withdraw guilty plea, which are discussed above. Additionally, Davis testified that his guilty plea should be withdrawn because he was given "bad advice" by his counsel through "no fault" of his counsel since his counsel did not have complete information on CI-2 and CI-3 necessary

to render competent advice about whether or not to plead guilty. See, R. Doc. 89, pp. 23-24. The District Judge denied Davis' motion to withdraw guilty plea, finding that his plea was knowing and voluntary and that withdrawal of same would not serve the interests of justice.

The District Judge then proceeded to sentence Davis. The District Judge informed Davis that he had reviewed the PSR and the written objections to that report, and after considering those objections and the testimony provided at the hearing on the motion to withdraw guilty plea, the amount of cocaine found attributable to Davis was reduced by more than twenty (20) kilograms, resulting in a total offense level of 31.[1] With a criminal history category of three (III), the District Judge found that the new sentencing guidelines range for Davis was 135 to 168 months, instead of 168 to 210 months. Defense counsel then argued that Davis should receive a sentence as close to the 120-month mandatory minimum as possible or a sentence at the low end of the guidelines range. The District Judge subsequently sentenced Davis to 150 months in prison with a supervised release term of five (5) years.

On January 5, 2009, Davis appealed to the U.S. Fifth Circuit Court of Appeals, seeking reversal of the Court's denial of his motion to withdraw guilty plea. The Fifth Circuit affirmed this Court's decision in that regard on June 10, 2009. On October 5, 2009, the U.S. Supreme Court denied Davis' petition for a writ of certiorari. Davis filed the present motion to vacate, set aside, or correct sentence on October 4, 2010, wherein he claims that his counsel was ineffective because he "failed to argue and/or object to certain activity

---

[1] The total amount of cocaine that the District Judge found attributable to Davis was 27 kilograms. Id., at p. 40.

which the Court and the PSR deemed 'relevant conduct,' thereby causing his sentencing guidelines to be enhanced which resulted in a two (2) level enhancement and an increase from [Criminal History] Category II to Category III."

**LAW & ANALYSIS**

To prove ineffective assistance of counsel, Davis must meet the two-pronged burden of proof set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

(1) that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and

(2) that the deficient performance "prejudiced" his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial where the result is reliable.

*Strickland*, 104 S.Ct. at 2064.

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. (See *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987)). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy. (See *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988)). The court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *Martin*, 796 F.2d at 817. Great

9

deference is given to counsel's exercise of his professional judgment. *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816. Mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error has no effect on the judgment. *Strickland*, 104 S. Ct. at 2066.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice from the alleged errors. *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988). To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland*, 104 S. Ct. at 2067. To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,104 S.Ct. at 2068. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Martin*, 796 F.2d at 816-17.

Davis asserts in his present motion that his counsel acted deficiently in failing to object to and challenge the "relevant conduct" set forth in the PSR, which resulted in his receiving a significantly higher sentence. The undersigned disagrees. As discussed above, both Davis' initial counsel, McLindon, and his subsequent counsel, Hudsmith, asserted objections to the "relevant conduct" set forth in the PSR and to the amount of cocaine attributed to Davis for sentencing purposes. McLindon specifically objected to the conduct and calculations set forth in Paragraphs 8 and 9 of the PSR, and Hudsmith

10

reiterated those objections, among others, in the "Sentencing Memorandum" filed on Davis' behalf on August 8, 2008 as well as during oral arguments at the sentencing hearing. As a result of those objections and arguments, the district judge decided to reduce Davis' "relevant conduct" calculation by over twenty (20) kilograms of cocaine, thereby also reducing his criminal history category by three (3) points and significantly lowering his sentencing guidelines range.

Davis now contends that his counsel was ineffective because they failed to specifically object to the "relevant conduct" discussed in Paragraph 7 of the PSR, which related to a March 31, 2005 traffic stop of CI-1, wherein $380,000.00 was seized. The PSR converted that sum of money into 21.7 kilograms of cocaine for purposes of "relevant conduct" because CI-1 told law enforcement that the seized money was proceeds from cocaine sales that belonged to Davis and that he was transporting the money from Baton Rouge to Houston for Davis. Davis argues it was "plain error to include th[at] seizure as relevant conduct." He has not, however, presented any competent evidence or argument demonstrating that the money in question did not belong to him, that it was inappropriate for the probation officer to convert the currency into an amount of cocaine for sentencing purposes, and/or that the conversion is somehow incorrect.[2] In fact, the conduct discussed in Paragraph 7 of the PSR was part of the factual basis of Davis' guilty plea to which he

---

[2] *See, Turner v. United States*, 2010 WL 3842579, *2 (E.D.Mo. 2010)(holding that counsel's failure to challenge the PSR's conversion of currency to determine the amount of marijuana attributable to the defendant was not a sufficient basis for finding ineffective assistance of counsel).

agreed, and his counsel was not obligated to assert objections that might result in a breach of the parties' plea agreement. *Turner*, at *2.[3] [4]

Furthermore, although Davis contends that the conduct in Paragraph 7 of the PSR was objectionable and could not be used as a basis for enhancing his base offense level because it "was not part of the same course of conduct or part of a common scheme or plan" as the crime of conviction, the Court disagrees. In *U.S. v. Rhine*, the Fifth Circuit Court of Appeals explained that, in calculating a defendant's base offense level in a drug offense case, the district court may consider other offenses in addition to the acts underlying the offense of conviction, as long as those offenses constitute "relevant conduct" as defined by the Guidelines. *U.S. v. Rhine*, 583 F.3d 878, 885 (5th Cir. 2009). "[T]he base offense level can reflect quantities of drugs not specified in the count of conviction if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." *Id.* In drug distribution cases, the Fifth Circuit has "broadly defined what constitutes the 'same course of conduct' or 'common scheme or plan'." *Id.*

---

[3] *See also, Henry v. U.S.*, 2006 WL 839435, *7 (S.D.Ill. 2006)(finding that the petitioner asserted no reason why his counsel should have objected to the PSR's determination of relevant conduct. The court noted that the PSR contained a relevant conduct calculation consistent with the calculation anticipated by the plea agreement and admitted by the petitioner both orally and in writing, and although the petitioner may have expressed displeasure with the amount orally to his counsel, he raised no such objections at the sentencing hearing despite being given an opportunity. The court also found, based upon the rules for calculating relevant conduct, that it was right to hold the petitioner responsible for the reasonably foreseeable drug amounts that his coconspirators dealt but with which petitioner was not directly involved. The petitioner's counsel's failure to object to the relevant conduct calculations on the grounds that petitioner was not personally involved with all the drugs was not deficient performance but was the proper exercise of professional judgment, and defense counsel was held not to be deficient for failing to make a frivolous argument).

[4] The plea agreement to which Davis agreed also fully informed him that he could receive a maximum sentence of not less than ten (10) years and not more than life imprisonment, a $4,000,000 fine, or both. *See*, R. Doc. 41, p. 3.

A "separate, unadjudicated offense may be part of a common scheme or plan - and thus relevant conduct, if it is "substantially connected to [the offense of conviction] by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* Several courts have concluded that, for two offenses to be considered part of a common scheme or plan, the acts "must be connected together by common participants or an overall scheme." *Id.* The Guidelines also state that "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to [the offense of conviction] as to warrant the conclusion that they are part of a single episode, spree, or an ongoing series of offenses." *Id.* Factors to consider in making that determination include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* The Fifth Circuit has "generally used a year as the benchmark for determining temporal proximity." *Id.*, at 887. For example, in *U.S. v. Miller*, the Fifth Circuit concluded that offenses separated by twenty-one (21) months were "relatively remote in time" and held that "other factors must be authoritatively present in order to overcome [that] long gap." *Id.*, quoting *U.S. v. Miller*, 179 F.3d at 966, 967, n. 10.

In the present case, approximately one (1) year separated the offense discussed in Paragraph 7 of the PSR and the offense of conviction. Thus, the Fifth Circuit's benchmark regarding the temporal proximity element is met. Furthermore, during the course of that year, the DEA agents investigating Davis became aware of other similar cocaine-trafficking offenses or attempted offenses by Davis. For example, within a month of the conduct discussed in Paragraph 7, another individual was arrested with five kilograms of cocaine

13

in his possession, and he, like the individual involved in the Paragraph 7 conduct, implicated Davis as a repeated drug-trafficker from whom he had purchased large quantities of cocaine on multiple occasions. In the subsequent months, other purchases of cocaine from Davis were arranged by a third individual; however, those purchases did not come to fruition because Davis had already sold the entirety of his cocaine supply before the purchases could be effectuated, suggesting that Davis was involved in a regular pattern of distributing cocaine to various individuals in the Baton Rouge area.[5] Then, on the date of Davis' arrest, another cocaine transaction was arranged in which Davis assured that same third individual that he was receiving a cocaine shipment and would have five (5) kilograms of cocaine to sell to him. When the police ultimately arrested Davis, 5.942 kilograms of cocaine were found in his possession at his residence. Even if the conduct discussed in Paragraph 7 of the PSR involved a larger quantity of cocaine than the offense of conviction, it appears that such was the case because that offense related to the payment/shipment aspect of Davis' cocaine-trafficking operation. The individual who was arrested on March 31, 2005 advised that he was transporting $380,000.00 on Davis' behalf to an unidentified source located in Houston to pay for cocaine that Davis had distributed. He further advised that he had previously built hidden compartments in two different vehicles for Davis for that purpose. Based upon additional information ascertained over the course of the year concerning Davis' other drug transactions and attempted

---

[5] According to Paragraph 9 of the PSR, after each of the failed sales, Davis had conversations with the third individual, which were recorded, wherein Davis advised that he had gotten rid of all of the cocaine in four or five hours, that it did not take long to get rid of the cocaine, and on one occasion, that the cocaine was going like "hot cakes." Davis therefore told the third individual to keep his phone on if he wanted to get the cocaine.

transactions,[6] it is apparent that the conduct discussed in Paragraph 7 was part of an "ongoing series" of similar offenses by Davis, and it was therefore proper for the Court to consider the March 31, 2005 incident as "relevant conduct" in determining Davis' base offense level. Accordingly, the failure of Davis' counsel to assert a specific objection to Paragraph 7 of the PSR was not deficient conduct.

In sum, Davis has failed to demonstrate how his counsel's objections/arguments, seeking a reduction of the amount of cocaine attributable to him and a sentence as close to the mandatory minimum as possible, are deficient; moreover, considering that the arguments asserted by his counsel did result in his "relevant conduct" calculation being reduced by over twenty (20) kilograms of cocaine (and a resultant reduction in his total offense level to 31), the Court does not see how Davis was prejudiced by his counsel's conduct. It appears that both of Davis' attorneys appropriately analyzed and objected to the PSR's recommendations concerning "relevant conduct," and the fact that he was sentenced in the middle of the sentencing guidelines range was not the result of ineffective assistance of counsel. According to the District Judge, as relevant to the sentencing determination as the amount of cocaine attributed to Davis, if not more relevant, was the fact that Davis had been previously convicted of a non-drug-related crime and, after having

---

[6] For example, the testimony of Agent Scott at the motion to suppress hearing revealed that the failed drug transactions had occurred because Davis was "having a hard time obtaining cocaine from his source of supply due to several losses which were incurred on the interstate [such as the March 31, 2005 $380,000.00 loss] and through drug seizures." *See*, July 26, 2006 Transcript of Motion to Suppress Hearing, p. 15. Also, on March 17, 2006, on the way to Davis' house where the 5.942 kilograms of cocaine were stored, Davis informed Agent Scott that "he was dead, basically, because of the additional loss he had incurred, and in fact, did discuss the large debt that was owed to his source of supply in Houston, Texas." *Id.*, p. 26. According to Agent Scott, Davis explained how he was repaying the debt owed to his supplier with vehicles and about how his source of supply was only allowing him to get five (5) or six (6) kilograms of cocaine at a time because of the money that Davis owed him. *Id.*, p. 30.

15

served prison time for that conviction, he nevertheless returned to a life of crime by selling drugs, even while still on probation for the prior offense. *See*, R. Doc. 89, p. 43. The District Judge clearly believed that a mid-guidelines range sentence was necessary to deter Davis from yet again returning to criminal activity upon release from prison for the instant offense. Davis has not presented sufficient arguments or evidence indicating that the District Judge's well-reasoned sentencing decision should be vacated, modified, or corrected, and his present motion should therefore be denied.

## **RECOMMENDATION**

For the above reasons, it is recommended that the Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (R. Doc. 97) filed by petitioner, Daryl W. Davis, should be **DENIED**.

Signed in chambers in Baton Rouge, Louisiana, March 3, 2011.

_____
**MAGISTRATE JUDGE CHRISTINE NOLAND**